WILLIAM A. COHAN, ESQ. (CA BAR #141804)
WILLIAM A. COHAN, P.C.
P.O. BOX 3448
Rancho Santa Fe, California 92067
(858) 832-1632
(858) 832-1845 (FAX)
Email: bill@williamacohan.com

Attorney for Defendant
RICHARD THOMAS GRANT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,    ) | Case No. 4:14-cr-00590-PJH-1 |
| Plaintiff,    ) | **DEFENDANT RICK GRANT'S OBJECTIONS TO PSIR; REQUESTS FOR DOWNWARD DEPARTURES; AND SENTENCING MEMORANDUM** |
| vs.    ) | |
| RICHARD THOMAS GRANT,    ) | |
| Defendant.    ) | Date: November 9, 2016<br>Time:<br>Courtroom: 3<br>Hon. Phyllis J. Hamilton |

Pursuant to Rule 32 of the Federal Rules of Criminal Procedure and L.R. 32-5(b), Defendant Rick Grant, by undersigned counsel, hereby submits his consolidated (1) objections to the Presentence Investigation Report ("PSIR"), (2) requests for downward departure from the advisory Guidelines range in the PSIR and (3) sentencing memorandum requesting a downward variance in determining a sentence in this case, including an order for restitution sufficient, but not greater than necessary, based upon factors contained in 18 U.S.C. § 3553(a).

Mr. Grant submits that the Court should sentence him to community service, Probation with the condition of continuing mental health treatment, and order restitution of $402,457. The Court should not impose a fine.

# I.

## STATEMENT OF FACTS

**A.    The Offense Conduct**

The October 11, 2016, draft of the PSIR stated:

6.    Richard Thomas Grant, Jr. (Grant) participated in SORCE (Southern Oregon Resource Center Education Service), and also used MyICIS, an online investment and digital money order service that was seized by federal agents in February 2007. Grant attended a seminar in the Caribbean hosted by Pinnacle Quest International (PQI), where SORCE, MyICIS, and similar products were promoted as a legal means to avoid income tax liability.

7.    The federal government prosecuted SORCE, MyICIS, and PQI for defrauding their investor/client victims, including Grant. Grant was led to believe, as many had been, that those were legal operations and believed some of them to be his legal representatives.

8.    In April 2008, the government filed a complaint to enjoin SORCE and its promoters from the sale of a plan or arrangement, purportedly securing tax benefits the promoters knew or had reason to know was false or fraudulent, and engaging in conduct that interfered with the administration of the enforcement of the Internal Revenue laws. SORCE was promoted through PQI, which sold products that falsely assured customers they could legally stop paying federal income taxes without repercussion. The government sought civil injunction against PQI in the Northern District of Florida. The government also indicted PQI's promoters with conspiracy to defraud the federal government based on PQI's predecessor organization called the Institute of Global Prosperity (IGP). IGP and PQI were marketed and sold in a multilevel marketing (MLM) structure.

9.    SORCE promoted what the government called an unlawful "disenfrachisement" scheme where the promoters falsely told customers that the federal income tax system is voluntary. They advised customers that they could legally opt out of the federal income tax obligations by revoking or not using their social security numbers and other government identification numbers. In the complaint to enjoin SORCE and its promoters the government conceded, "Defendants' customers have been harmed by the defendants' promotions because customers have paid SORCE significant sums to establish worthless legal entities and obtain erroneous tax advice that has caused customers to fail to file required federal tax returns and understate their income tax liabilities. While most, if not all, of the defendants' customers knew or had reason to know they were engaging in fraud by participating in defendants' scheme, it is possible that some customers may have been misled by defendants about the legality of the defendants' scheme."

*See* Excerpt of 10/11/16 PSIR, attached as Exhibit A[1].  In addition, Mr. Grant was represented and assisted (and victimized) by Freedom Law School and Peymon Mottahedeh with various correspondence to the IRS and FTB and filings in Federal District Courts, Tax Court and the Ninth Circuit Court of Appeals.  *See e.g.,* PSIR (Dkt. No. 165) at ¶ 11.  Mr. Grant and Mr. Mottahedeh so testified as well at trial.

Dr. George W. Woods, Jr., M.D. testified at trial that (1) Mr. Grant suffered from a mental disease, defect, or condition that affected his ability to understand his legal duty to file individual income tax returns and pay income taxes, and (2) this condition increased Mr. Grant's gullibility concerning schemes to "legally" avoid income tax.  *See* Excerpt of Reporter's Transcript ("RT") of 6/16/16 Trial at 42-43 and 47, attached as Exhibit B.  Dr. Woods testified to his expert opinion that:

> Mr. Grant presented ... a number of symptoms of a mood disorder.  He presented with pressured speech.  He presented with grandiosity.  He had an unusual set of beliefs.  Not only about the Internal Revenue Service but also about other things that were going on in the world, about certain dietary problems that the world was facing, certainly the issue about the Internal Revenue Service and the requirement that he pay taxes... [He] described a family history of significant migraine headaches in his mother, his brother, and in himself and his headaches had been there all his life.  He described his brother as... having a history of manic depression... when I asked him about his sleep, he said that sleep was a fantasy to him; that is, he rarely slept for more than an hour or two hours a day but that he didn't need much sleep....

*See* 6/16/16 RT at 18 (Exhibit B); *See also id.* at 25, 28, 30-31, 33-36.  Dr. Woods offered a differential diagnosis of bipolar disorder versus temporal lobe dysfunction/ epilepsy to categorize -- to the extent possible -- these symptoms.  *Id.* at 30, 48, 55.

Dr. Woods explained: "bipolar disorder is really manifested by impaired judgment.  You see people that have bipolar disorder as often having real vulnerability, real impaired judgment."  *Id.* at 31.  Dr. Woods also explained:

---

[1]The Probation Officer removed this relevant and probative text from the final PSIR, filed on 10/26/16 (Dkt. No. 165) due to the government's objection that (1) this evidence was mostly or entirely excluded at trial and, paradoxically, (2) it was rejected by the jury.  No authority was presented precluding this information from consideration at sentencing.  Accordingly, Mr. Grant objects to removal of these paragraphs, and offers them for the Court's consideration.

[W]hen we think about temporal lobe dysfunction or... what's also called temporal lobe epilepsy... you see symptoms that are very, very similar to bipolar disorder... they may have magical thinking. They may believe things that other of us – well, we probably aren't sure are true. They may have obsessive-compulsive disorder. They may have rigidity in their thinking. This is something that Mr. Grant described to me that is described in other situations as well. Mr Grant described his beliefs as unique to him, as beliefs that set him apart, that really – things that he knew that nobody else knew. (Exhibit B at 33-34).

\* \* \*

Both bipolar disorder and temporal lobe dysfunction undermine the ability of a person to evaluate risk. It impairs judgment. It often impairs insight. In the Diagnostic and Statistical Manual No. 5, which is really a classification system not a comprehensive text book of psychiatry but they talk about financial indiscretions as being one of the factors that one sees in bipolar disorder... Those financial indiscretions or impaired judgment, difficulty effectively weighing and deliberating in specific areas frequently found in mood disorders; certainly in bipolar disorder. *Id.* at 41.

Dr. Woods interviewed Mr. Grant's wife, Carol Grant, who provided additional background and corroborated these symptoms. Mrs. Grant "acknowledged how their life became increasingly isolated because Mr. Grant would talk ... of his unusual thinking regardless of the situation. She had to move away from friends. She had to kind of change her life." Mrs. Grant also acknowledged the pressured speech, unusual thinking and obsessive -compulsive qualities. *Id.* at 38-40.

Dr. Woods stated: "I would describe [Mr. Grant] as unaware of the gravity of the circumstances and unaware of -- the fact that the resources he relied upon were inaccurate." *Id.* at 56.

The reports of Dr. Woods and the government's psychiatrist Dr. Eric Chan, M.D. mirrored the symptoms described above and the earnest belief Mr. Grant held that no law required him to file income tax returns and pay income taxes. Dr. Woods opined in his September 10, 2015 report at pages 2-3:

Mr. Grant suffers from a neuropsychiatric disorder characterized by magical thinking, pressured speech, grandiosity/paranoia, obsessive compulsive behavior, mood lability, strong moral beliefs, gullibility, circumstantiality (excessive use of irrelevant details), and impaired judgment... Mr. Grant believes he was acting in good faith. In fact, due to his neurocognitive disorder, his capacity to discern that he was being defrauded and not acting lawfully was diminished.

The government's psychiatrist Dr. Eric J. Chan, M.D. agreed with Dr. Woods that Mr. Grant suffered from mental illness that impaired his functioning:

> ...Mr. Grant does exhibit certain personality traits such as suspiciousness and grandiosity. These personality traits may have contributed to **his belief that he has no legal obligation to pay taxes... During my examination Mr. Grant demonstrated a strongly held conviction that he had not committed a crime by failing to pay his taxes.** He also discussed beliefs in conspiracy theories and other unconventional "concerns the average person is unaware of." (Emphasis supplied)
>
> &#42;&#42;&#42;
>
> ...**Mr. Grant has come to believe that he has no obligation to pay taxes** because of information presented to him via radio programs and books. Such a belief is consistent with his overall distrust of government and his maladaptive personality traits. These particular beliefs about taxes are part of a larger sub-culture with which Mr. Grant, along with many others, has identified. It is not uncommon for people to adopt similar viewpoints after being exposed to such materials. (Emphasis supplied)

*See* 1/11/16 Chan Report at 1-2. Dr. Chan merely rejected Dr. Woods' labels, including Bipolar Disorder or Temporal Lobe Disorder. *See* Under Seal Defendant's Corrected Response to "Government's Motion Requesting A *Daubert* Hearing And Exclude Testimony of *Defendant*'s Mental Health Expert" (Dkt. No. 94). Both experts agreed on their essential findings that Mr. Grant's "suspiciousness/paranoia," "grandiosity," and "maladaptive personality traits..." contributed to his strongly held belief "... that he has no obligation to pay taxes. ... Such a belief is consistent with his overall distrust of the government...." *Id.* at p. 4, ¶7.

The government chose not to call Dr. Chan as a trial witness because of the exculpatory admissions in Dr. Chan's report and strenuously objected at trial to defense attempts to present exculpatory evidence from Dr. Chan's reports. This evidence is highly probative of whether the Court should grant a downward departure from or variance below the guidelines.

Mr. Grant described his responsibility for the offense conduct to the Probation Officer:

> I don't deny that what I did was wrong. I should have filed and paid taxes. I had a good faith belief I did not have to pay income taxes. I now know I do... I have tremendous regret for committing the offense. I am sorry I caused the government so much problem and expense. I am

capable of making decisions but was locked into the belief that I did not have to pay taxes. *See* PSIR (Dkt. No. 165) ¶20.

## B.  The Man Before The Court

Rick Grant is 63 three years old. He has been and remains married to Carol Grant, since 1977. Two daughters were born to their union and now Mr. Grant is also a grandfather, expecting two additional grandchildren on or about the time of his sentencing hearing.

Mr. Grant has suffered from his mental illness or condition for decades before the offense conduct, continuously through the relevant period to the present as well as for the foreseeable future. Mr. Grant now recognizes his mental health problems, seeks treatment, and needs much more.

For nearly 40 years Mr. Grant was a hard working small business owner, forced out of the partnership by his brother Randall Grant, who refuses to honor the terms of their separation agreement. Thus, in addition to the pain from his criminal convictions, Mr. Grant has been forced to sue his brother Randall to pay restitution from the business he worked for decades to build. *See* Complaint, attached as Exhibit C. Meanwhile, consistent with the testimony of numerous witnesses during the trial, Randall has wrought havoc on the business, terminating key employees, purchasing expensive unjustified capital equipment, and straining or destroying business relationships with its customers, vendors and employees. Rick needs proceeds recovered from the lawsuit to pay restitution.

Mr. Grant testified at trial about his personal characteristics and history, also detailed in Dr. Woods' initial report. *See* 9/10/15 Woods report (Dkt. No. 50) at pgs. 8-10. Mr. Grant also provided relevant information to the Probation Officer, summarized in ¶¶ 41-78 of the PSIR. Mr. Grant will not restate that information here, but offer letters submitted by the people who are closest to him, his daughters and wife.

Mr. Grant's younger daughter Brittany Baldwin wrote:

"My dad has lived a life of hard work and modesty. His accumulation of material possessions were not for lavish personal gain or status but to live out a dream to educate and adventure... For years, he drove a beat up minivan with over 300,000 miles on it... I mention his disinterest in extravagant living to illustrate that his portrayal at the trial wasn't an accurate representation."

"[M]y entire upbringing is littered with small, daily examples of his unwavering kindness and honesty... He has always sought opportunities to help others for no personal gain."

"Over the past five to ten years, I've begun to notice that my Dad's concern about the state of our country has gone from informed and apprehensive to extremely anxiety driven and paranoid... My fear is that, unbeknownst to the people around him (all of whom could've helped), he's been on a mission to collect information that only played into his anxieties and was preyed on by individuals and an organization that have taken advantage of his vulnerability... imprisonment will only worsen his condition... I feel an incredible sense of sadness that his perception of the world around him became so grim, so much so that he felt compelled to do what he did."

*See* Sentencing Letters, attached as Exhibit E. Mr. Grant's eldest daughter Lindsay Suhor wrote:

"My father is a hard-working, passionate, and compassionate man. He has never been driven by materialism or greed but instead by his desire to provide for his family and to pursue his lifelong dream of educating people, particularly about his passion: the biology of the Tropics."

"[H]e could often be found working in our garage manufacturing small plastic pieces or at the shop on weekends or even in the middle of the night to address machinery issues... Instead of spending his hard-earned money on nice cars, a lavish home, or extravagent vacations, my parents chose to give my sister and me an excellent education. Growing up, our modest cars over the years (a Ford Taurus, Dodge Caravan, Ford Winstar minivan, and Toyota Camry), would be run into the ground before we got a 'new-to-us' car. Our house was a rented spec home whose main renovations consisted of new carpet twice during the 18 years that I lived there."

"...old planes that my father and uncle had purchased from scrapyards to be restored from scratch. My father was not a collector of frivolous luxuries but sought practical application of these items. We would work hard stripping paint and completing any number of tasks needed to get planes in a condition for someone to invest in this dream."

"In recent years, from about high school forward (2000), I feel like his protectiveness and preparedness have unfortunately become all consuming – bordering on paranoia... I feel that the development of paranoia and distrust of government/economy contributed significantly to his decision to stop paying taxes... he has expressed to my sister and me that he is beginning to realize that... he is on the far end of the bell curve of how most people view the world and that he may indeed need

to seek counseling to deal with those feelings... It would be truly wrong to imply that my father's action was done out of greed or ill intent."

*Id.* Carol Grant wrote:

"The Rick I know is a loving and protective family man who has steadfastly followed his dreams and is unselfishly generous."

"Rick's mother suffered from incapacitating migraines that frequently sent her to the hospital and, as a result, she greatly depended on Rick to help raise his younger brothers until the time he went away to college. ... The second impact of such great burden early on ... evolved into him becoming a worrier. ... Without first consulting with me, he purchased boxes of freeze-dried food that filled up much of our garage. Rick felt that most people weren't aware of what was going on in the world. Wanting to warn people to prepare, it was common for him to bring it up in conversations with complete strangers – from the UPS delivery man to an auto service employee. ... His anxieties were further validated when mainstream shows would publicize content that played into his fears."

"His anxieties about the future became so great that he would encourage our daughters to buy freezers for food storage. He even sent a generator to one of our daughters so she and her family would be prepared. ... His concern extended beyond to his employees at Grant Engineering, who he would give money to so they could also buy deep freezers and stock up on food."

"... We were portrayed as living a lavish lifestyle but our life is quite modest. We happen to live in a home in a nice neighborhood because of the generosity of a couple we met through connections with the flying boat. ... They offered to let me and our daughter stay at an empty, spec home they owned while [Rick] was away. When he returned, they allowed us to continue staying in the home for minimal rent until they finally said they wanted to sell the house to us in 1995, 'as is'. ... We ended up purchasing the house after 10 years of renting. Most of our furnishings are hand-me-down from Rick's parents and relatives and we haven't spent any money on restoration of the house in the 30 years that we've lived here, except for repairs when needed."

"... [Rick] has apologized for keeping me in the dark and for what he was doing. He regrets more than anything that he didn't file his taxes and I know he would never do that again. I'm concerned about Rick's physical well-being as he currently has kidney damage but also deeply concerned that imprisoning Rick will only isolate him from his family and I worry what he will be like when he gets out." *Id.*

## II.

## ARGUMENTS

### A.  Legal Standards

After *United States v. Booker,* 543 U.S. 220 (2005), district courts possess

broad discretion to sentence below the recommended Guidelines range for individuals based upon their particular circumstances. The Supreme Court noted that "district courts must treat the Guidelines as the 'starting point and the initial benchmark,'" because the Sentencing Commission used empirical data, national experience and were guided by an expert and professional staff. *See Kimbrough v. United States*, 552 U.S. 85, 108 (2007). The Court added three crucial caveats: first, the Guidelines are meant to govern the "ordinary cases," *see id.* at 109 ("in the ordinary case, the Guidelines will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives") (citation omitted); second, the sentencing judge, on the other hand, has "greater familiarity with ... the individual case and the individual defendant ... than the Commission or the appeals court"; *id.,* and finally, when it is apparent that certain Sentencing Guidelines were not the product of empirical data and study and national experience, they need not be applied. *See also Gall v. United States,* 552 U.S. 38,46 (2007) (citing *Kimbrough* for this proposition).

In *Booker*, the Court severed 18 U.S.C.A. §§ 3553(b)(1) and 3742(e), rendering the Guidelines advisory in a court's sentencing decision. *Id.* at 756-757. While *Booker* requires a sentencing court to consider the Guidelines, the court may tailor the sentence in light of other statutory concerns. *See id.* Even pre-*Booker*, a probationary disposition would be well within the Court's discretion. *See* USSG §§5B1.1(a)(2).

The "parsimony principle" set forth in 18 U.S.C. § 3553 provides that courts should only impose a "sentence [which is] *sufficient, but not greater than necessary*, to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2)." (emphasis added). Here, parsimony[2] provides for community service and probation so Mr. Grant can

---

[2]"That brings to the surface the real issue: overcriminalization and excessive punishment in the U.S. Code." *See Yates v. United States,* 135 S. Ct. 1074, 1100 (2015)(J. Kagan dissenting). "Most district judges... will try to make the punishment fit the crime... Still and all, I tend to think... § 1519 is unfortunately not an outlier, but an emblem of a deeper pathology in the federal criminal code." *Id.*

continue to obtain mental health treatment and move forward, including payments toward restitution and IRS civil collection activities, which are likely to continue for twenty years.

Section 3553(a)(1) expressly provides for consideration of Mr. Gant's characteristics in determining the sentence. In rendering the Guidelines advisory, the Court restored the district court's duty to consider § 5H *et seq.* Furthermore, § 3553(a)(5) and case law post-*Booker* calls for consideration of policy statements issued by the Sentencing Commission. The following "Specific Offender Characteristics" provide a basis for downward departure and are useful in determining conditions of probation or home detention: Age in Combination with Other Factors, U.S.S.G. §5H1.1; Vocational Skills, U.S.S.G. § 5H1.2; Employment Record, U.S.S.G. § 5H1.5; Family Responsibility and Community ties, U.S.S.G. § 5H1.6; and Criminal History, U.S.S.G. § 5H1.8.

**B.    Legal Objections to the PSIR**

   **1.    Base Offense Level In The Offense Level Computation At PSIR ¶17, Page 6 and ¶23, Page 8:**

The Probation Officer received the $2,118,394 figure from the government, which provided Form 4549-A dated 10/19/16 (attached as F). However, examination of the summary schedule following the 10/19/16 Form 4549 reveals that only $1,192,896 is tax due to the IRS and FTB. The $1,192,896 figure does also not take into consideration an adjustment for community property, which is described in more detail below. *See e.g.*, Exhibit G (Govt's Trial Exh. 361, 5/3/16 Form 4549-A). Adjusting for community property and/or removing interest and penalties from the tax loss reduces the corresponding tax loss under USSG §2T4.1 (Tax Table) to less than $1,500,000. Accordingly, the correct Base Offense Level, Adjusted Offense Level and Total Offense Level are 20. *See* USSG §2T4.1(H). The resulting advisory Sentencing Guideline range is 33 - 41 months.

The Court may, but is not required to, include interest and penalties in the tax

10

loss amount.  The general rule is that the tax loss calculation "does not include interest or penalties." U.S.S.G. § 2T1.1 cmt. n.1. There is a narrow exception to this general rule for "willful evasion of payment cases under 26 U.S.C. § 7201 and willful failure to pay cases under 26 U.S.C. § 7203." *Id.; accord, United States v. Black*, 815 F.3d 1048, 1054 (7th Cir. 2015). *United States v. Gordon*, 291 F.3d 181, 187 (2d Cir. 2002) ( "Tax loss under § 2T1.1 is intended to reflect the revenue loss to the government from defendant's behavior.").

Several factors support not including interest and penalties: (1) the penalty provisions are draconian and exaggerate revenue loss to the government; (2) interest provisions are excessive and the government could not achieve commensurate interest from market investments; (3) together penalties and interest effectively double actual taxes due and owing, which unfairly increases corresponding sentencing range by multiplying actual harm caused by the offense; (4) the loss amount here is effectively the result of sentencing entrapment: IRS could have collected from Mr. Grant ten years ago instead of building the criminal case based on Mr. Grant's challenges by Freedom Law School to the 2001 and 2002 assessments, appeal to the Tax Court, and eventually to the Ninth Circuit.  The government blended its evasion of payment and evasion of assessment theories during trial so the narrow exception for evasion of payment cases does not apply to most of the years between 2000-2015.  The addition of interest and penalties to the loss amount is not mandatory; the court has discretion to limit tax loss to actual taxes due and owing.

Pursuant to USSG §§2T1.1 and 2T4.1(H), the Base Offense Level is 20 since the amount of *actual* loss is less than $1,500,000.

### 2.   Adjustment For Obstruction Of Justice At PSIR ¶27, Page 8:

This adjustment is erroneously based on: "[Mr. Grant's] actions, through filing successive frivolous petitions to quash criminal investigation summonses, and writing a letter to the IRS posing as his business partner constitutes obstruction of justice." Also, contrary to PSIR ¶ 19, it is not obstruction of justice for Mr. Grant to lawfully

exercise rights to: (1) contest his tax liability through IRS administrative procedures, and appeals thereof, or (2) assert his objections in judicial proceedings to IRS summonses and subpoenas for his private and confidential financial information from disclosure. Notably, no court found Mr. Grant's petitions to quash sanctionable for being frivolous.

The evidence at trial did not prove, even by a preponderance, that Mr. Grant wrote either letter to the IRS posing as Randall Grant. The evidence at trial showed Mr. Grant assisted his brother Randall in responding to IRS actions, and the letters were authorized and signed by Randall Grant. "[Mr. Grant] did not sign or send either of those letters to the IRS. He related that those letters were prepared with assistance from Freedom Law School... Randall Grant signed them and authorized them to be sent, or sent them himself, to the IRS. The contention that [Mr. Grant] unilaterally responded to the IRS Summons to Randall Grant was conclusively refuted by the testimony of the IRS Revenue Agent who established that the summons was served at Randall's gated residence with no notice to Mr. Grant." PSIR ¶11. "Randall was shown a copy of a letter received by the IRS indicating it was from him. Randall reviewed the letter and stated he did not recall sending that letter and did not recognize the handwriting to be his... He was also shown a typed letter, dated July 12. 2010, addressed to the IRS and received by the criminal investigator. Randall stated he did not recognize the letter, and while the signature looked like his, he did not recall the letter or signing it, and did not recall authorizing Grant to send out the letter." PSIR ¶16. This evidence simply does not establish, particularly after cross-examination at trial concerning these letters, that Mr. Grant forged his brother's signature or sent these to the IRS without Randall's authorization. "I do not recall" and "I do not recognize" are not proof of anything, much less obstruction of justice.

Accordingly, an adjustment under USSG § 3C1.1 is not appropriate.

**3.    Total Offense Level At PSIR ¶ 31, Page 8:** Pursuant to   legal objections 1 and 2, above, the correct Total Offense Level is 20, with a resulting

advisory sentencing Guidelines range of 33-41 months.

**4.    Several Factors Warrant A Departure From The Applicable Sentencing Guideline Range In PSIR ¶104, Page 20:**

As explained below under request for departures, Mr. Grant should be given departures for Diminished Capacity and Combination of Circumstances pursuant to U.S.S.G. §§ 5K2.13 and 5K2.0.  There are several Specific Offender Characteristics present to an extraordinary degree.  Here, a downward departure is also appropriate to accomplish a specific treatment purpose.  Mr. Grant and the community will greatly benefit from his continuing with and expanding his present treatment program, including consultation with therapist Jeremy Gordon. PSIR ¶69.  *See* U.S.S.G. § 5C1.1, Application Note 6 ("Such a departure should be considered only in cases where the court finds that (A) the defendant... suffers from a significant mental illness, and (B) the defendant's criminality is related to the treatment problem to be addressed.")

**C.    Factual Objections To The PSIR**

**1.    Paragraphs Quoted Above From 10/11/16 PSIR Should Be Included In the Final PSIR.**

The PSIR should include paragraphs quoted above (p. 2) about promoters of SORCE/MyICIS/PQI victimizing individuals such as Mr. Grant. *See* Exhibit A. This information is properly within the scope of the Presentence Investigation.  Sustained government objections under FRE 403 during trial are no basis to exclude from the PSIR and consideration at sentencing.   This information is relevant for BOP designation.

**D.    Requests For Downward Departures.**

Mr. Grant sets forth several grounds for departures which the Guidelines specifically encourage.

**1.    Departure For Diminished Capacity And/Or, Variance**.

Pursuant to U.S.S.G. §5K2.13,  downward departure is warranted and it is an

1   encouraged basis to depart, thus not precluded due to the nature of the offense. *See*

2   *id.* at 5K2.0 App.n.3(B)(i)-(ii). *See also United States v. Cantu*, 12 F.3d 1506, 1513

3   (9th Cir. 1993)(recognizing the applicability of §5K2.13 "no matter what the nature

4   or severity" of the mental condition at issue)(citation omitted); *United States v. Smith*,

5   330 F.3d 1209, 1213 (9th Cir. 2003)(explaining that the Commentary to §5K2.13

6   defines "significantly reduced mental capacity" as "a significantly impaired ability

7   to (A) understand the wrongfulness of the behavior comprising the offense or to

8   exercise the power of reason; or (B) control behavior that the defendant knows is

9   wrongful"). The Court should depart due to Mr. Grant's diminished capacity from his

10  mental illness.

11      It is indisputable that (1) the onset of Mr. Grant's mental illness occurred years

12  before the relevant period of the indictment, and (2) Mr. Grant suffered from his

13  mental illness during the relevant period. *See* Under Seal Defendant's Corrected

14  Response to "Government's Motion Requesting A *Daubert* Hearing And Exclude

15  Testimony of *Defendant*'s Mental Health Expert" (Dkt. No. 94).

16      It is not dispositive that some of Mr. Grant's co-workers and his brother claim

17  they were not aware of his mental illness or the impact on his judgment.  Mental

18  disabilities are often non-obvious so it is not surprising that his limitations "were not

19  open, obvious, and apparent" to everyone around him, including even people who

20  have family members with similar mental health problems. *See Walz v. Ameriprise*

21  *Fin.*, *Inc.*, 779 F.3d 842, 846 (8th Cir. 2015).

22      In *United States v. Christensen*, 18 F.3d 822, 826 n.6 (9th Cir. 1994), the Ninth

23  Circuit noted that if a "mental illness qualified as an extraordinary case," the district

24  court would have authority to depart downward under U.S.S.G. §§ 5H1.3 and 5K2.0.

25  Section 5K2.13. Diminished Capacity (Policy Statement) states:

26      A downward departure may be warranted if (1) the defendant committed
        the offense while suffering from a significantly reduced mental capacity;
27      and (2) the significantly reduced mental capacity contributed
        substantially to the commission of the offense. Similarly, if a departure
28      is warranted under this policy statement, the extent of the departure

should reflect the extent to which the reduced mental capacity contributed to the commission of the offense.

None of the prohibitions to the diminished capacity departure apply to Mr. Grant: (1) his diminished capacity was not caused by the voluntary use of drugs or other intoxicants; (2) the facts and circumstances of his case do not indicate a need to protect the public because his offense was not a crime of violence or threatened violence; (3) he has no prior criminal history; and, (4) he was not convicted of an offense under chapters 71, 109A, 110, or 117, of title 18, United States Code.

A diminished capacity departure can be appropriate after conviction at trial for tax offenses. In *United States v. Cockett,* 330 F.3d 706 (6th Cir. 2003), the Sixth Circuit affirmed the trial court's decision to depart downward for diminished capacity after defendant Virginia Cockett was convicted for twenty-one counts of aiding and assisting in preparation of false income tax returns, in violation of 26 U.S.C. § 7206(2). The government appealed the departure for Cockett because the jury determined that she acted voluntarily and deliberately in committing her offense. *Id.* at 711. Cockett's challenge at trial to the willfulness element and the jury's rejection of this defense did not preclude a departure for diminished capacity. The *Cockett* Court held that "the government is not correct in concluding that the jury's verdict, finding Cockett had acted willfully, and the judge's finding of diminished capacity are necessarily in conflict... Cockett could voluntarily and intentionally violate the tax laws, but nevertheless be impaired in her ability to exercise the power of reason." *Id.* at 713. Such is the case with Mr. Grant as established by Dr. Woods and Dr. Chan.

The government's psychiatrist agreed that Mr. Grant exhibited symptoms of mental illness that diminished his capacity, but quibbled over labels. To evade individual diagnosis, Dr. Chan substituted references to "such conspiratorial beliefs are not bizarre, and are in fact shared by many others ... these particular beliefs about taxes are part of a larger subculture...." (*See* PSIR ¶¶63-68). Dr. Chan admitted his conclusion -- shared by Dr. Woods -- that Rick Grant believed in good faith he was

not required to file tax returns or pay income taxes. The Court excluded all of Dr. Chan's admissions at trial, but should recognize this undisputed evidence for sentencing.

The Court should depart downward at least twelve (12) levels, which represents "the extent to which the reduced mental capacity contributed to the commission of the offense." Such a departure will move Mr. Grant into Zone B of the Sentencing Table which makes him eligible for a sentence of Probation with conditions of community confinement or home detention. *See* USSG §§ 5B1.1(a)(2), 5C1.1(c). The Court should exercise its sentencing discretion to depart or vary based on Mr. Grant's diminished capacity from the Guidelines identified in the PSIR to a sentence that permits him to continue his current treatment while on Probation performing community service.

## 2. Mr. Grant's Crime Constituted Aberrant Behavior, Thus Warranting Further Downward Departure.

Mr. Grant's participation in the instant offense departed substantially from his typical behavior. U.S.S.G. § 5K2.20 states, in part, that the Court may depart downward under this policy statement only if the defendant committed a single criminal occurrence or single criminal transaction without significant planning. In *United States v. Fairless*, the defendant received a downward departure from 30-60 months for a bank robbery charge in part because his actions constituted aberrant behavior. 975 F.2d 664 (9th Cir. 1992). In *United States v. Vieke*, defendant was granted a four-level downward departure to probation in a credit card fraud case where the crime was "totally out of suit with the rest of her life and the behaviors" even though the fraud went on for years. 348 F.3d 811 (9th Cir. 2003). Furthermore, in *United States v. Jones*, the court did not abuse its discretion in departing downward by three levels to probation when, as one of eleven factors, it considered that the crime constituted aberrant conduct where the defendant had been law abiding until age 35. 158 F.3d 492 (10th Cir. 1998).

To qualify for departure on this ground, a defendant's conduct must represent a marked deviation from an otherwise law-abiding life and is unavailable if the offense involved: (1) serious bodily injury or death; (2) use or discharge of a firearm; (3) a serious drug-trafficking crime; or (4) the defendant has more than one criminal history point.  Mr. Grant's involvement in the present offense constitutes aberrant behavior within the meaning of U.S.S.G. § 5K2.20.

Mr. Grant meets all the criteria for departure based on aberrant behavior.  His offense greatly deviated from his consistent course of conduct, manifested throughout the first fifty years of his life, exemplified by his work ethic,  acceptance of responsibility, and lack of any criminal history.

### 3.     Mr. Grant  Is Older and Is Unlikely to Be a Recidivist.

*United States v. Nellum*, 2005 WL 300073, 2005 U.S. Dist. LEXIS 1568 (N.D. Ind. Feb. 3, 2005) (Simon, J.) was a post- *Booker* decision, in a crack case where defendant's guideline range was 168-210 months.  In imposing a sentence of 108 months, the court held that the defendant was unlikely to recidivate because of his age of 57, relying on government statistics.  According to a United States Sentencing Commission Report released in May, 2004, "Recidivism rates decline consistently as age increases. Generally, the younger the offender, the more likely the offender recidivates." See U.S.S.C., Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at p. 12, http://www.ussc.gov/publicat/Recidivism-General.pdf. *United States v. Nellum*, 2005 U.S. Dist. LEXIS 1568 (N.D. Ind. Feb. 3, 2005).

In *U.S. v. Hamilton*, 323 Fed. Appx. 27, *31 (2d Cir. 4/14/2009) (unpub.), a cocaine case, the court remanded for the district court's failure to consider policy considerations with regard to age recidivism not included in the Guidelines; *U.S. v. Carvajal*, 2005 WL 476125 (S.D.N.Y.  2/22/05) (unpub.)[in drug case, career offender guideline of 262 months too great; client will be 48 when he emerges from prison; the goal of rehabilitation "cannot be served if a defendant can look forward

17

to nothing beyond imprisonment. Hope is the necessary condition of mankind, for we are all created in the image of God. A judge should be hesitant before sentencing so severely that he destroys all hope and takes away all possibility of useful life. Punishment should not be more severe than that necessary to satisfy the goals of punishment."]

In *U.S. v. Wadena,* 470 F.3d 735 (8th Cir. 2006), a sixty-seven year old defendant pled guilty to one count of conspiracy to commit mail fraud. The district court imposed a sentence of five years probation, a downward variance from the recommended 18-24 months under the Guidelines.  The Eighth Circuit held that it was proper for the district court to impose a below Guidelines sentence of probation, in part, because "Wadena's age and recent deterioration in his health reduce the risk of re-offending." *Id.* at 739.

Mr. Grant is sixty-three years old, never involved in criminal activity, nor with a criminal propensity.  His chance of recidivism is low.  Therefore, the defense respectfully requests this Court to apply the rationale in the *Nellum* case in fashioning a sentence well below the guideline range; otherwise, Mr. Grant will be part of the aging prison population per the PSR's recommendation that he be in custody from age 63 to approximately age 67. *See* Exhibit H (OIG Report*).

**4.    Steadfast Employment History**.

Mr. Grant has a long history of stable employment, which the PSR notes at ¶78.  *See United States v. Big Crow*, 898 F.2d 1326, 1331 (8th Cir. 1990) [excellent employment record]; *United States v. Jones*, 158 F.3d 492 (10th Cir. 1998) [where defendant pled guilty to possession of a firearm by a prohibited person, the district court did not abuse its discretion in departing downward by three levels where, as one of the eleven factors, it considered the defendant's "long impressive work history ..."]; *United States v. Alba*, 933 F.2d 1117 (2d Cir. 1991) [longstanding employment at two jobs] and; *United States v. Jogmohan*, 909 F.2d 61 (2d Cir. 1990) [exceptional employment history and nature of the crime].  Therefore, Mr. Grant's work history

and his lack of any entanglement with the criminal justice system collectively support the proposed disposition in this case.  *See* PSIR ¶78, 79.

### 5.   Lengthy Incarceration Would Impair Progress in Rehabilitation.

If Mr. Grant receives a lengthy sentence of imprisonment, it will unduly impair his progress in rehabilitation and treatment.

In *United States v. Hawkins*, 380 F.Supp.2d 143, 165 (E.D.N.Y. 2005), aff'd, 228 Fed. App'x 107 (2d. Cir. 2007), a sentence of probation was imposed in a fraud case where the applicable Guideline range was 12-18 months. The court held that a sentence of incarceration "will in effect doom her... Rehabilitation should not now be destroyed by wanton and unthinking application of mechanical rules for imprisonment." *See also United States v. Davis,* 2008 WL 2329290, 5(S.D.N.Y. June 5, 2008) [same in child porn case.] *See also United States v. Arreaga*, 2006 WL 278156, at *7 (S.D.N.Y 2/2/06) [finding that rehabilitative goals of sentencing were best served by imposition of a non-Guidelines sentence where defendant had an apparent need for psychiatric and emotional counseling and showed a willingness to obtain such treatment.] *See also United States v. Martin*, 827 F.Supp. 232 (S.D.N.Y. 1993) [district court departed downward from 48 to 30 months to enable defendant to be eligible for boot camp.  The Court found that boot camp might help the defendant make a clean break with his former lifestyle and departure proper if boot camp provided the best hope of protecting the public, deterring misconduct and providing rehabilitation.] *See also United States v. Duhon*, 541 F.3d 391 (5th Cir. 2008) [where defendant convicted of child pornography and guidelines 33-40 months, district court's sentence to probation reasonable in part "because of the district court's strong emphasis on [Duhon's] general need for treatment."]

Mr. Grant now recognizes and accepts he suffers from mental illness -- the critical first step toward recovery.  He should continue his treatment regime, including psychotherapy at the Berkeley Therapy Institute or elsewhere under supervision during Probation.  *See* PSR ¶70.

1

### 6.    Totality of Circumstances Warrants a Downward Departure.

2      The Ninth Circuit has long held that a "combination of factors" can together

3   constitute a mitigating circumstance justifying departure. *See United States v. Cook*,

4   938 F.2d 149 (9th Cir. 1991).   In *Cook*, the Court explained that "[t]here was no

5   reason to be so literal minded as to hold that a combination of factors cannot together

6   constitute a 'mitigating circumstance.'" *Id.* at 153; *see also* U.S.S.G. § 5K2.0,

7   Grounds for Departure [acknowledging circumstances that warrant departure may not

8   be listed in Guidelines.]  The factors identified above in Sections II.A. - II.G, when

9   viewed in the aggregate, support a departure under the guidelines. They are also

10   offered in support of a combination of factors departure.   Mr. Grant therefore

11   respectfully requests that these factors be considered in their totality as well as

12   individually when reviewing all factors warranting a departure from the guideline

13   range set forth in the PSIR.

14      One district court has observed that the statutory mandate to consider "the

15   kinds of sentences available" under 18 U.S.C. § 3553 (a)(3) is "rarely mentioned in

16   the sentencing courts." *United States v. Guiro*, 887 F.Supp. 66, 68 (E.D.N.Y. 1995).

17   "While the choices are many in theory, they may be fewer in practice." *Id.* (internal

18   citations omitted).  The Guidelines "do not displace the traditional role of the district

19   court in bringing compassion and common sense to the sentencing process. ... In areas

20   where the Sentencing Commission has not spoken... district courts should not hesitate

21   to use their discretion in devising sentences that provide individualized justice."

22   *United States v. Williams*, 65 F.3d 301, 309-310 (2nd Cir. 1995).

23      Mr. Grant respectfully urges the proposed departures be granted based upon

24   the compelling combination of circumstances that his case presents.  The Court has

25   the authority to depart under a totality of the circumstances rationale or to vary the

26   sentence downward based upon mitigating factors present here. *See* PSIR ¶ 104. Mr.

27   Grant suffers from a mental illness for which he is now being treated.  His mental

28   illness was the primary reason he committed this offense.  He had never been

someone who lacked respect for or who chose to break the law before this case. Under *United States v. Anders*, 956 F.2d 907 (9th Cir. 1992), a "unique combination of factors can constitute a mitigating circumstances warranting a downward departure." The validity of this view was affirmed by the Supreme Court in *Koon v. United States*, 518 U.S. 81 (1996); *see also United States v. Cook*, 938 F.2d 149, 152 (9th Cir. 1991) (espousing view that combinations of circumstances are valid grounds for downward departures.) All of the enumerated factors and circumstances set forth herein call for a sentence of Probation, which will enable Mr. Grant to continue receiving treatment, and evaluation and supervision by the Probation Office.

**E.  The Court Should Vary From The Advisory Sentencing Guidelines To A Sentence Of Probation With Appropriate Conditions Of Supervision**

The factors set forth in 18 U.S.C. §3553(a) to be considered in this case favor leniency for Mr. Grant:

> (1)  the nature of the circumstances of the offense and the history and characteristics of the defendant;

Rick Grant's history and characteristics, especially the characteristics which he has demonstrated throughout the past 63 years, his love of and close ties with his family, and his present desire to perform community service and continue treatment for his mental illness, all indicate he can and will do more if given a chance at recovery instead of being warehoused in prison.

> (2)  the need for the sentence imposed –
>
> > (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> > (B)  to afford adequate deterrence to criminal conduct;
> > (C)  to protect the public from further crimes of the defendant; and
> > (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

The offense itself, while a serious one, was not committed in any sophisticated or devious manner, demonstrated by Mr. Grant's efforts maintaining accurate books and records at Grant Engineering for partnership returns prepared every year (even

though they were not filed), which formed the basis for the tax assessed.  As demonstrated at trial, no income was concealed from the IRS and the information and assets necessary for assessments, and collection was always readily available to the IRS.  He will not recidivate: this criminal episode is out of character with the entirety of his life and he is no longer working or planning to work in the capacity of a person financially responsible for a small and growing business.  He poses no threat to the public or to himself as he is now going to therapy and is committed to recovery with the full knowledge of and support from his wife and children.  Incarceration would only burden U.S. taxpayers, and harm Mr. Grant and his family.  When considering rehabilitation, studies and common sense establish that incarceration does  not achieve that goal -- at least not where serious mental health problems are the issue.

(3)     the kinds of sentences available;

A sentence of probation, including, if necessary, halfway house placement, house arrest and/or community service are all available instead of incarceration.

(4)     the applicable category of offense committed by the applicable category of defendant as set forth in the Guidelines . . . .

The PSIR has calculated the Guidelines and Mr. Grant has provided his objections to those calculations and requests for departures.

(5)     any pertinent [Guidelines] policy statements . . . .

Mr. Grant identified specific policy statements which provide particular guidance in this case in his objections to the PSIR and requests for departure.

(6)     the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and

There is no risk of unwarranted sentencing disparity here.  Mr. Grant is in a unique situation given his history of medical problems well before, during and after the relevant conduct and the IRS' failure to take appropriate assessment and collection action for a period of many years. This case is outside the heartland of tax evasion cases, but several criminal tax cases involving vastly greater sums are listed

22

1  for the Court's consideration in Exhibit I, attached.

2       (7)    the need to provide restitution to any victims of the offense.

3       There are no unusual issues of restitution in this case and Mr. Grant does not
4  object to restitution for the outstanding taxes.  Mr. Grant is going to make restitution
5  as ordered by the court from any funds recovered in his lawsuit against Randall Grant
6  for his 50% of Grant Engineering, and from sale of the family home and, eventually,
7  the airplanes.  A custodial sentence will significantly impact Mr. Grant's ability to
8  recover funds for the government from the business, home and airplanes.

9       The "parsimony principle," set forth in 18 U.S.C. § 3553 provides that courts
10  should only impose a "sentence [which is] *sufficient, but not greater than necessary*,
11  to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2)."  18 U.S.C. §
12  3553(a) (emphasis added).  Here, the parsimony principle supports a sentence of
13  probation so that Mr. Grant can continue to receive mental health treatment, provide
14  valuable community service and make payments toward restitution and civil
15  assessment and collection by IRS and FTB.  *See, e.g., United States v. Edwards*, 595
16  F.3d 1004, 1018 (9th Cir. 2010) (sentencing defendant with prior fraud conviction,
17  convicted of a $500,000 bankruptcy fraud and who faced a 27-33 month Guideline
18  ange to probation); *United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008)
19  (sentencing defendant convicted of selling $1 million in counterfeit access cards to
20  5 years supervised release and community service); *United States v. Ruff*, 535 F.3d
21  999 (9th Cir. 2008) (applying variance to sentence defendant with 30-37 month
22  guideline range to 1 year and 1 day).

23       This Court is also free to conclude that the tax loss tables should not be given
24  great weight in this case because of the IRS' failure to take timely action to pursue
25  assessments and collection from Mr. Grant.   The tax loss amount inflated the
26  Guidelines for Mr. Grant's sentence.  Here, *Gall* and *Kimbrough* apply.  IRS strategy
27  during the IRS CDPH, Tax Court and Ninth Circuit proceedings concerning tax years
28  2001 and 2002 coupled with Mr. Grant's mental illness -- exploited by SORCE,

MyICIS, PQI and Freedom Law School -- inflated (effectively multiplying) his Guideline sentencing range. Accordingly, tax loss is not entitled to great weight in light of the particulars of this case.

## III.

## ADDITIONAL SENTENCING REQUESTS

First, in the event that the Court sentences him to a period of custody and confinement by the Federal Bureau of Prisons ("BOP"), Mr. Grant respectfully requests that he be permitted to voluntarily surrender after BOP designates him to his institution of designation. This request is consistent with the Probation Officer's recommendation at PSIR page 26.

Second, in the event the Court imposes a custodial sentence, Mr. Grant respectfully requests that this Court recommend to BOP that Mr. Grant be designated to serve any custodial portion of his sentence at Federal Prison Camp ("FPC") Pensacola, in Florida. Alternatively, Mr. Grant respectfully requests a recommendation for designation at an appropriate facility in or near the state of Florida, so that he can be close to his parents, who live in Viera, Florida, as well as relatively near Houston, Texas, where he anticipates his wife will be living. Mr. Grant and his wife are winding up their affairs in California and he will not have a home or close family any longer in California.

## IV.

## CONCLUSION

For the foregoing reasons, Mr. Grant respectfully requests that the Court sentence him to the maximum term of Probation with community service -- not custody -- with conditions of supervision including continuing treatment for his mental health problems. Under the circumstances of this case, which is outside the heartland of tax evasion primarily motivated by greed, departure(s) and/or variance from the advisory sentencing Guidelines to a sentence of Probation with community service and restitution is sufficient, but not greater than necessary to achieve the

relevant considerations under § 3553(a).

DATED: November 2, 2016.                    Respectfully Submitted,

WILLIAM A. COHAN, P.C.

 s/ *William A. Cohan*
California Bar No. 141804
P.O. Box 3448
Rancho Santa Fe, CA 92067
Tel:   (858) 832-1632
Fax:   (858) 832-1845
E-mail: bill@williamacohan.com
Attorney for Defendant RICHARD
GRANT

## CERTIFICATE OF SERVICE

I hereby certify that on November 2, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following:

COLIN CHRISTOPHER SAMPSON, ESQ.
colin.sampson@usdoj.gov

MATTHEW J. KLUGE
matthew.j.kluge@usdoj.gov

 s/ *William A. Cohan*
William A. Cohan, Esq.